# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| ANDREW COLE, | : | CASE NO. |
| | : | |
| Plaintiff, | : | Judge: |
| | : | |
| vs. | : | Magistrate: |
| | : | |
| JPMORGAN CHASE BANK, N.A., | : | |
| | : | JURY TRIAL DEMANDED |
| Defendant. | : | |
| | : | |

## COMPLAINT

Comes now Plaintiff Andrew Cole who complains against the Defendant and states as follows:

## JURISDICTION

1. Plaintiff is an individual and a resident of the State of Colorado. Defendant is a mortgage servicer as defined by 12 U.S.C. §2605. Count I of this Complaint arises under 12 U.S.C.§ 2605(e) and (f) and this Court has jurisdiction under 12 U.S.C. § 2614. Further, Defendant JPMorgan Chase Bank, N.A. (hereafter "Chase") is a national bank organized under the National Bank Act and has its home office and principal place of business in Ohio. The matter in controversy exceeds $75,000.00 excluding interest and costs. This Court thus alternatively has jurisdiction under diversity of citizenship as provided by 28 U.S.C. Sec. 1332. The Court further has supplementary jurisdiction of the state law claims that are so

related to the federal claims in this action that they form part of the same case or controversy under 28 U.S.C. § 1361.

## ALLEGATIONS COMMON TO ALL COUNTS

2.     Plaintiff is an owner of a principal residence located in Grand Junction, Colorado.  Defendant Chase has been the servicer of Plaintiff's Mortgage since on or about May 1, 2011.  Prior thereto, Chase Home Finance, LLC (hereafter referred to as "predecessor") was closely connected to Chase and was acquired by Defendant Chase at that time. Both have claimed to be the holders of Plaintiff's note and deed of trust, and are and were the servicers of the note and deed of trust associated with the residence (referred to herein collectively as "the agreement"). Defendant Chase is also the current servicer of the note and deed of trust constituting the agreement between the Plaintiff and the loan's owner which secures the aforementioned property.

3.     In late 2009 Plaintiff, a mechanic, lost his job with a GM dealership because of the recession.  He had and still has a home with a USDA mortgage serviced by Chase Home Finance, LLC and, as of May 1, 2011, Defendant Chase. The home is and was very important to Plaintiff because it was a home for his young children, but it had minimal economic value due to a number of factors including its condition. Furthermore, Plaintiff has remained gainfully employed at a lesser income throughout the entire time.  As such the property has always been an ideal candidate for a loss mitigation arrangement as required by USDA regulations.

Moreover, any other action was and is very costly to USDA were it to pay Defendant's claim for USDA insurance.

4. Beginning with the loss of his job in 2009, Plaintiff has been trying to save his home through loss mitigation. This case involves over a five year effort of Chase to avoid its loss mitigation obligations and profit itself, at USDA's expense, by repeatedly misrepresenting to Plaintiff that his numerous complete loss mitigation packages were somehow incomplete.

5. Defendant induced consumers such as Plaintiff to apply for loss mitigation for the purpose of "papering its files" in case of a USDA investigation, but was at the same time misrepresenting compliance with loss mitigation to USDA. All along Defendant was not complying with loss mitigation but had a business plan to repeatedly claim the borrower's submissions were somehow defective.

6. Further, Defendant has repeatedly avoided its obligations to answer letters written under the authority of RESPA as well as applicable state law that asked Defendant questions that required embarrassing admissions of noncompliance if truthfully answered.

7. This five years has caused Plaintiff excruciating emotional distress considering its impact on his small children and his reaction to the sheer arrogance of Chase.

8. Plaintiff executed and submitted to Defendant or its predecessor, Chase Home Finance, LLC, at least six loss mitigation packets which were

substantially complete and thereafter countless supplements requested by Chase on many more occasions.

9. Chase continually, despite supplementation, never considered his applications in good faith. In one instance Defendant denied the application for a reason that was blank on the letter. Each time Plaintiff was advised by way of either Chase form letters or Chase's attorney, that more documents were supposedly needed. In one instance Chase claimed it could not read a pay stub that was clearly visible. In another, plaintiff was advised his packet would not be considered because not submitted a set but not communicated number of days before a foreclosure sale. When Plaintiff called the Chase representative's attention to the fact that it had been submitted within the claimed required period, the representative changed her story to claim untimeliness under the same number of business days. This went on for so long that it was apparent that Chase was acting in bad faith, had no intent of ever engaging in loss mitigation, was pretending to comply, and that further submissions were a complete waste of time.

10. Plaintiff pleads on information and belief that Chase engaged in falsely claiming packets were incomplete on a nationwide basis. The basis for this belief is Plaintiff's counsel's confidential work product in conferring with attorneys around the nation who have advised they have received these same excuses from Chase. As a result Chase plays a game of attrition wherein it wears borrowers out by repeated submissions until they give up then Chase can claim to regulatory authorities that

it has tried to mitigate their losses but the borrowers failed to cooperate or until arrearages get too high to modify the loan.

11. Plaintiffs allege on information and belief that Defendant's irrational behavior in rejecting economic loss mitigation while putting on a false front of complying is motivated by a conflict of interests with FHA similar to the conflicts revealed in *Why Servicers Foreclose When they Should Modify and Other Puzzling Behavior*, National Consumer Law Center, Inc. (2009); *Mortgage Servicing*, Letvin, Twomey, 28 Yale Journal on Regulation 1 (Winter 2011). The conflict takes a number of forms but all are based on the proposition that servicers such as Chase do not take the losses on these loans so profiteer at the expense of the investor or governmental insurer through such devices as junk fees, earlier recoupment of advances and ancillary REO activities.

12. Plaintiff brought a previous action on June 4, 2012, in *Cole* v. *JPMorgan Chase Bank, N.A.* in Case No. 1:12-cv-1452 REB KLM (D CO) over actions that had occurred prior thereto. The case was dismissed without prejudice on jurisdictional issues of standing, in that Plaintiff's bankruptcy trustee owned the claim, and the case was terminated on April 22, 2015. Since then the trustee verified abandonment of the claim in favor of Plaintiff. Further, many of the actions incurred herein accrued since the filing of Plaintiff's previous case and bankruptcy on May 31, 2011 in Case No. 11-23058 SBB (D CO) and are outside the scope of that case.

## Count I – RESPA

Plaintiff, for his cause of action under Count I states:

13.     By January of 2014, Plaintiff had been trying to obtain loss mitigation for about four years from Defendant and its affiliate Chase Home Finance.  By early 2001 Plaintiff noted that Chase Home Finance's conduct made no sense and appeared to be a front to avoid required loss mitigation. In frustration, Plaintiff sent a letter to Chase Home Finance, LLC, dated February 5, 2011, that was received on March 8, 2011, asking specific questions regarding his loss mitigation efforts. The letter stated that it was propounded under 12 U.S.C. § 2605(e). The purpose of the letter was to ask questions Chase could not truthfully answer without embarrassing responses demonstrating noncompliance with loss mitigation. Defendant totally failed to answer that letter.

14.     When Plaintiff filed *Cole* v. *JPMorgan Chase Bank, N.A.* in Case No. 1:12-cv-1452 REB KLM (D CO) Defendant moved to dismiss under Rule 12(b)(6) claiming it need not answer the letter because it was "not a QWR" in that it "[O]nly seeks information relating to the denial of Plaintiff's loan modification applications, the identity of the Loan's 'investor,' and a request that Plaintiff be reconsidered for a loan modification."

15.     Finally, after enduring almost another three years of claims that his continuing packet submissions were incomplete, 12 U.S.C. § 2605(k) and its regulatory framework became effective. This statute and its regulations made it clear that servicers such as Chase, must respond to QWRs about loss mitigation. As

such, Plaintiff sent and Chase received in Columbus, Ohio at its designated QWR address another letter.

16. By this time, Plaintiff had was very emotionally invested in his efforts, not just to save his young children's home but because but because it became apparent that Chase was trying to bully consumers into allowing Chase to take their homes at the expense of the children, the taxpayers through USDA and the housing market so as to profit itself. It became apparent to Plaintiff that Chase considered itself above the law, and would squash any dissenting consumers.

17. The new letter repeated much of the information in the 2011 letter and asked many of the same questions but brought current to 2014.

18. The initial paragraph of the letter stated:

"As you know Colorado is a non-judicial foreclosure state in order to encourage lending. As such review of foreclosures is limited; that is why your truthful, accurate and complete answers are vital to contest an improper foreclosure, as I was not considered properly for a modification on my USDA loan.  Further, it is that much more important that you correct my account if the answers disclose problems with my account."

17. Defendant sent a letter in response dated September 5, 2014 and signed by its attorney Jeremy D. Peck.  That letter either failed to answer or evaded the substance of the letter as follows:

a. Plaintiff's letter asked:

"In December of 2009 I suffered a loss of income and called Chase. At first I was asked to make a big payment which I borrowed from relatives. Then I was placed on a forbearance plan that was very painful to myself and my family. My first question is as follows.

>    When I called in I was told I could apply for a modification but I had to do the forbearance first to be able to apply for the modification, why was this?"

Defendant's response ignored this question.

b.   Plaintiff's letter asked:

>    "Later in April 2010 when I could not make the full payment someone finally mentioned Home Affordable Modification Program (HAMP). I was told to submit the packet and immediately started applying as our family home is important to us. At first I was initially told I had insufficient income. Then, when my wife became employed, I was told to submit a modification package by your representatives. I complied with the request promptly. When I did not hear I called and I was told the package was not complete and told what I needed to submit. Again I promptly did so, however, despite my compliance, I was denied supposedly because my package was incomplete despite the fact that I sent everything requested. All of my submissions included Chase's cover sheet and the loan number. I was then immediately thrown into foreclosure. I have several questions about these submissions.
>
>    1.   What was incomplete about my submissions?
>    2.   What do your notes show about this?
>    3.   If something was incomplete why was I not asked for it instead of denied and put in foreclosure?"

Defendant's response stated only that: "the related financial analysis showed that he did not have adequate income for the workout options available" completely evading the question.

c.   Plaintiff's letter asked:

>    "When my submissions with my wife's income were not even considered and I was thrown into foreclosure, I hired an attorney. We called in and were told I should reapply. The representative, one Willette, told us what we needed to do to reapply. She told us to submit a number of documents that my attorney's office told me exceeded the normal amount of documents required under HAMP. This included a breakdown of all household expenditures not ordinarily required by lenders but that Chase wanted it. The representative told me that we

should then call in and check that the packet was received so the foreclosure would be put on hold. In an attempt to cooperate, we carefully put it together and submitted it seven days ahead of the foreclosure sale to insure time to get the process going.  I called in after the new compete packet was submitted and was told all was fine, it would be escalated to a supervisor, and the foreclosure would be extended.  Then later in the day I called in with my lawyer. The representative told us the package we had worked so hard to prepare (37 pages) would not be considered because it was not submitted seven days ahead (which we were never told). When we called to the agent's attention that it was in fact submitted seven days ahead to avoid a problem (although I was not told that) the representative transferred me to a supervisor.  That supervisor then told us that it would not be considered because it was not submitted seven *business days* ahead. I could not believe this as we were never so advised and would have submitted it earlier.  The supervisor told me there was nothing she could do. She said it was "investor guidelines" but when we asked who the investor was she said only "Chase." She also said this was a "farm" government loan. Please correct my account by considering this application, modifying my payment and charging me the proper amount.  Also, I have questions about this.

  1. Please tell me who the 'investor' is so I may contact the proper party. Please give me the proper name, address and phone number.
  2. Is this a government loan? What agency do I need to contact to straighten this out?  My understanding is that it is USDA. Please give me the proper name, address and phone number.

  3. Is it Chase's policy to *advise* people that their HAMP packet must be in seven *business* days before a foreclosure sale to be considered? What does Chase claim was done in my case about this?

  4. HAMP rules advise that if investor guidelines prohibit a modification the servicer must attempt to secure a waiver; what has Chase done to get me considered in light of the fact that I was denied despite giving Chase every document required and then submitted the new package even though I should not have had to reapply, assuming this seven business days even was some type of "investor" guideline?

  5. The supervisor told us the 'investor' was Chase; is Chase unable to get a waiver from itself or its affiliate.

      6.    Fully describe what investor guidelines would have been broken by giving me the modification and why."

The responss, although identifying the "investor" evaded or ignored most of the questions in that paragraph naming only a few "examples" of missing documents.

    d.    The letter asked:

"Finally after numerous calls wherein my lawyer called to the attention of the representative how hard we worked and that Chase never told us about seven days or seven business days, they said they would continue our sale and consider us.  Then we received a letter after our sale was continued, telling us our packet would not be considered because it was not in seven days before the continued sale.  How do you explain this?"

The response failed to address this question.

    e.    The letter asked:

"We then called in and talked to yet another representative.  We told her about the continued sale and the letter denying the modification due to the so called late packet, the representative told us the reason that my modification was denied was because the "investor" this time USDA, did not participate in HAMP.  When we called her attention to this the call was dropped. When we called back we got someone else who said they did have the packet and would review it. Why did the first representative say USDA did not participate then hang up on us?"

The response failed to address this question.

    f.    The letter asked:

"I am re-applying now; how will Chase consider the fact that I was not properly considered before and Chase has refused my payments for a long time. How will Chase handle the arrearage since I was not allowed to make payments for so long. All I seem to get is more requests and lost documents; for years. It seems as if Chase claims lost documents until the arrearage gets big due to interest and fees then is setting me up to claim I do not qualify under standards that fail to consider servicer fault. How does Chase plan to account for this?"

Chase responded simply that its investigation revealed no error occurred with respect to his applications. This was not a statement of the reasons why Chase believed the account to be correct but simply was a lie.

18. As a result of the Defendant's evasiveness to his letter, Plaintiff after years of trying to get the truth out of Chase, suffered severe emotional distress from a sense of Defendants continued failure to engage in meaningful loss mitigation when the letter should have finally corrected the problem by Chase finally admitting its failures and trying to make things right. This distress was largely from the Defendants' "above the law" attitude expressed by their noncompliance. Plaintiff re-experienced anxiety all because Defendants had "rigged" the loss mitigation process required by USDA, was caught by the government in the national mortgage settlement but then continued to evade his qualified written requests. It made Plaintiff experience a greater feeling of helplessness to invoke his legal rights.

WHEREFORE: Plaintiff prays judgement in such sum as is just and reasonable plus his attorney's fees and costs.

### Count II - C.R.S. §§ 38-40-103 and 38-40-104

Plaintiff, for his cause of action under Count I states:

19. Plaintiff restates his allegations common to all counts and to Count I.

20. Defendant regularly engages in the collection of payments on mortgages and deeds of trust for owners of evidences of debt secured by mortgages or deeds of trust as contemplated by C.R.S. § 38-40-103 and so

collected and continue to collect from Plaintiffs.

21. Defendant was required by Federal Regulations to engage in the aforementioned loss mitigation duties prior to instituting foreclosure and also prior to continuing a foreclosure. As such those duties were "duties imposed by law" as contemplated by C.R.S. § 38-40-103.

22. Plaintiff repeatedly and in good faith attempted to resolve the matter asking for help and by contacting Defendant Chase repeatedly and providing such things as requested.

23. Each of the aforementioned letters constituted written requests as contemplated by C.R.S. § 38-40-103(2) informing the Defendant of its violations and requesting limited, targeted information.

24. Defendant entirely failed to respond to Plaintiff's 2011 letter and rendered a noncompliant response to his 2014 letter as set forth in Count I.

25. As a result of the foregoing, Plaintiff sustained the same damages as alleged in Count I.

WHEREFORE: Plaintiff prays judgement in such sum as is just and reasonable plus his attorney's fees and costs.

### Count III – Colorado Consumer Protection Act

Comes now Plaintiff and for his cause of action against Defendant Chase under Count III states:

26. Plaintiff restates, re-alleges and incorporates herein each and every allegation common to all counts.

27. Defendant Chase, as a residential mortgage servicer, is engaged in the business of offering services to a large number of consumers in Colorado.

28. In the process of offering its services, Defendant, in accord with its agreement with USDA, agreed to perform loss mitigation functions prior to acceleration and foreclosure, in part, to keep people in their homes as required by USDA.

29. That based upon information and belief based upon review of the scholarly articles previously set forth herein and counsel's observation of the industry and his knowledge of the Defendant Chase's extensive presence in Colorado as a residential mortgage servicer, all of Defendant Chase's actions herein were part of a nationwide and statewide business plan and pattern of conduct, aimed at profiting, avoiding losses or both, at the expense of consumers and USDA. A reasonable period of discovery will provide more specifics but the profiteering ordinarily involves running up default servicing fees such as late fees as well as engaging in profitable REO related services paid to Chase by USDA. The plan involved moving a large volume borrowers who cannot make full timely payments to foreclosure sales despite the fact that it knows it has not complied with these conditions which would make defaults less costly to USDA. In short, Defendant has turned a program designed to encourage private home ownership into a profitable foreclosure business for Chase at the expense of the taxpayers.

30. In order to effectuate the foregoing business plan, Defendant needed to cause a large volume of personal residences to be sold at foreclosure sales but it

needed to deceive the public, USDA, mortgage trustees and the courts into believing it was complying with loss mitigation when it was not, in order to keep regulators from sanctioning it. To do that it needed to extensively paper its files with false attempts to engage in loss mitigation. To do that it had to appear to convincingly solicit and consider applications. Defendant adapts and varies its deceptive and unfair business practices based on the foreclosure laws of each state, but nationally its pattern is to solicit applications but always claim they are incomplete and blame its failure to loss mitigate falsely on borrowers.

   31. In Colorado, Defendant can only accomplish its purpose by directly and deliberately lying to consumers about the characteristics of the services it has rendered.

   a. It misrepresents to consumers, including Plaintiff, that it actually considers consumers for loss mitigation, knowing the applications will not be considered in good faith but that Chase will claim they are incomplete. Defendant misrepresents that consumers can save their home through loss mitigation inducing them to put together loss mitigation packages, which is time consuming and emotionally difficult. Huge number of Colorado distressed borrowers, including Plaintiff, go to the effort to comply, often repeatedly.  Then Chase line employees send out hundreds if not thousands of such letters weekly falsely claiming the packets are incomplete.

   b. Then it periodically falsely certifies to USDA compliance with loss mitigation with its papered files backing it up.

32. Because of the reliance of the public and USDA, Defendant has constructed a Colorado wrongful foreclosure mill in loss mitigation cases free of government interference.

33. That all of the foregoing were perpetrated by Defendant during the ordinary course of its business of mortgage servicing.

34. As a direct result of the Defendant's acts, Plaintiff received a clear message that Defendant arrogantly believed itself to be a big bank that considered itself above the law and that it was going to ignore all legal authority, state, local, or federal that it may be breaking in trying to foreclose on his home. This conduct further sent the clear message that the bank considered itself so above Plaintiff that it could disregard the law in his case. As such Plaintiff suffered severe emotional distress that was a real injury as follows.

Plaintiff's whole life was "up in the air" and he was constantly worried and anxious about where he and his kids would sleep or live. The Defendant's failure to respond, even to his qualified written request, made Plaintiff feel helpless. He thereby lost substantial concentration on his work and responsibilities as a father of small children, lost motivation to work and was irritable with everyone including his small children. As a result of this helplessness he became "stressed out" constantly getting irritated with his small children over minor things, then he suffered guilt over that irritability. He went from very fun loving dad to a dad who has a hard time taking his mind off of house problems and the injustice of Chase's arrogance in ignoring the law to be really with his kids like he was. Further,

Plaintiff's wife could not take the pressure of the potential house loss and his wife left the household due to the strain thereby causing Plaintiff to lose the support and consortium of his wife. Further, the stress has caused Plaintiff to be less active causing him to spend his time trying to plan for what will happen if he loses his home and he has gained 75 pounds from that inactivity.

35. The Plaintiffs foregoing damages were a loss of a protected interest.

36. That the Defendant's conduct was performed in bad faith as more fully set forth herein.

WHEREFORE: Plaintiff prays judgment against the Defendant under C.R.S. § 6-1-113 for the greater of such sum as is just and reasonable for their actual damages, that the actual damages awarded threefold, statutory damages of $500 and Plaintiff's attorneys fees plus costs.

**Count IV – Intentional Infliction of Emotional Distress**

Comes now Plaintiff and for his cause of action against Defendant Chase under Count IV states:

37. Plaintiff restates and incorporates all of the allegations of this complaint.  Plaintiff advised Defendant that this dwelling was the family home for several children.

38. Plaintiff advised Defendant that this dwelling was the family home for several children.

39. The Defendants thereby engaged in extreme and outrageous conduct and did so recklessly or with the intent of causing the plaintiff severe emotional distress in several or all of the following respects:

a. The Defendant placed itself in a position of power over Plaintiff and thousands of UDSA borrowers by undertaking the responsibilities of a USDA lender then, placing itself between USDA and the borrowers, turned a government program aimed at using taxpayer funds to encourage home ownership into a profitable "foreclosure business" for itself, paid for by USDA.

b. The Defendant, having been placed on notice that Plaintiff was a single dad with small children, used Plaintiff to paper its files by repeatedly claiming Plaintiff's loss mitigation packets were incomplete to the point of absurdity, which kept Plaintiff trying for five years.

41. As a direct result of the Defendant's acts Plaintiff suffered the injuries set forth in Count III.

WHEREFORE: Plaintiff prays judgment against the Defendants in such sum as is just and reasonable together with interest and his costs herein expended.

Respectfully submitted by:

/s/ Blair K. Drazic
Blair K. Drazic
Colorado Bar #39879
321 Rood, Unit 2
Grand Junction, CO 81501
Phone 970-623-1193
Fax 888-858-0992
E-mail: blairdrazic@gmail.com

And


/s/Steven C. Shane
Steven C. Shane (0041124)
P.O. Box 73067
Bellevue, Ky. 41073
(859) 431-7800
(859) 431-3100 facsimile
shanelaw@fuse.net

**Trial Attorneys for Plaintiff**